**KASHA K. POLLREISZ**
California State Bar No. 204148
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467, Ext. 3737
Facsimile: (619) 687-2666
Kasha_Pollreisz@fd.org

Attorneys for Mr. Crosby

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(**HONORABLE JANIS L. SAMMARTINO**)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 07CR3236-JLS |
| Plaintiff, | ) | |
| v. | ) | STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTIONS |
| TRAVIS PAUL CROSBY, | ) | |
| Defendant. | ) | |

**I.**

**STATEMENT OF FACTS**[1]

**A. Robbery and Investigation**

On July 18, 2007, the U:nion Bank of California located at 8630 lake Murray Boulevard, San Diego, California was robbed. During the robbery, the bank robber passed a handwritten note to the bank teller. The note allegedly read in part, "this is a robbery. Keep your hand where I can see them. If you move or tell anyone else, I'll shoot/kill them. There is another guy waiting for me." The bank robber was described by the victim teller as a white male in his early to mid 30's, approximately 6'2" tall, and weighing approximately 245 pounds.

[1] This statement of facts is based on the probable cause statement provided by the government attached to the complaint. Mr. Crosby does not admit their accuracy and reserves the right to challenge them at a later time.

On September 26, 2007, detectives with the San Diego Police Department received information from a confidential source that Travis Paul Crosby had bragged about robbing a bank in the area of El Cajon or La Mesa, and had netted $20,000 from the robbery. Crosby claimed to have robbed the bank approximately one month before.

On September 27, 2007, upon reviewing Mr. Crosby's criminal history, an agent discovered that between September 2001 and December 2001, Mr. Crosby allegedly robbed four banks in San Diego County. Included among those banks was the September 25, 2001 robbery of the Union Bank of California, 8630 Lake Murray Boulevard, San Diego, California. This is the same Union Bank alleged in this indictment.

On September 27, 2007, the agent reviewed bank robberies committed in San Diego County during 2007. During the review, the agent discovered that on July 18, 2007, the Union Bank of California, 8630 Lake Murray Boulevard, San Diego, California was robbed by a man allegedly matching Mr. Crosby's physical description. The robber netted $2,069 as a result of the robbery.

On September 27, 2007, the agent reviewed reports from Mr. Crosby's four 2001 bank robberies and the reports from the July 18, 2007 robbery. In the commission of each of his four bank robberies in 2001, Mr. Crosby allegedly passed lengthy handwritten notes to the victim tellers. Mr. Crosby also spoke to each of the victim tellers during the course of each robbery. Additionally, on two of the four 2001 robberies, Mr. Crosby made reference in his demand notes to a partner stationed outside of the bank with a weapon.

On September 28, 2007, Racheal Crampton, the victim teller of the July 18, 2007, robbery, reviewed a six-pack photographic lineup of potential bank robbery subjects. Crampton identified Crosby, whose photograph was shown in position number four in the lineup, as the man who robbed her on July 18, 2007.

On October 1, 2007, Lorena Gonzales, Crosby's former probation officer, was shown three video surveillance photographs of the July 18, 2007, robbery. Gonzales indicated that the robber depicted in the photographs appeared to be Mr. Crosby. Gonzales was intentionally not made aware of the investigation of Crosby prior to her review of the surveillance photographs.

//

**B. Grand Jury and Indictment**

The indictment in the instant case was returned by the January 2007 grand jury. That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns' instructions deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[2]

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" *See id.* at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were

---

[2] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam). Mr. Crosby has already moved to dismiss under these cases, but has acknowledged that the rulings in them did not support his position. Having actually read the 2007 instructions, Mr. Crosby now believes that those cases do not permit the excesses here.

[3] See also id. at 20 ("You're all about probable cause.").

> excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See id. at 20.[4]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).[5] The district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27.

On November 29, 2007, an indictment was filed charging Mr. Crosby with Bank Robbery in violation of 18 U.S.C. § 2113(a).

## II.

## THIS COURT SHOULD ORDER THE GOVERNMENT TO REVEAL THE CONFIDENTIAL INFORMANT'S IDENTITY, INDUCEMENTS, AND OTHER INFORMATION

The discovery provided by the government indicates there was a "Confidential Source" working with agents on the investigation. If this is true, this informant is possibly a percipient

---

[4] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.

[5] The "in most instances" language suggests that there may be some limit on this principle. Again, counsel has ordered the full transcript, and it will likely resolve the question posed in the instant footnote.

witnesses and must be revealed to Mr. Crosby.

**A. Disclosure of the Informants' Identity and Whereabouts Must Be Ordered Due to the Fact that the Informants May Have Material Evidence of Guilt or Innocence.**

A defendant is entitled to information concerning a confidential informant when the confidential informant possesses material and helpful information. In Roviaro v. United States, 353 U.S. 53, 59 (1957). The Supreme Court acknowledged the public interest in protecting the identity of confidential informants in order to encourage the free flow of information apparently necessary in criminal prosecutions. However, the Court expressly limited the scope of this privilege ruling that the interest in the anonymity of the informant must yield when disclosure "is essential to the fair determination of a cause." Id. at 61; United States v. Whitney, 633 F.2d 902, 911 (9th Cir.1980), cert. denied, 450 U.S. 1004 (1981). The Roviaro Court held:

> Where the disclosure of the informant's identity or the contents of his communication is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the privilege must be waived. In these situations, the trial court may require disclosure and, if the government withholds the information, dismiss the action.

Id. at 60-61.

While the Court declined to create a fixed rule with respect to disclosure of a confidential informant, four considerations are relevant: 1) the crime charged; 2) the possible defenses; 3) the possible significance of the informant's testimony; and 4) other relevant factors. Id.

The "relevant and helpful" language of Roviaro has been interpreted by the Ninth Circuit to require disclosure of the identity of the informant when the informant is a percipient witness. In United States v. Cervantes, 542 F.2d 773, 775 (9th Cir. 1976) (en banc), the court concluded that a "percipient witness" must be disclosed even if that witness is a "confidential informant." The court reached the same result in United States v. Hernandez, 608 F.2d 741, 744-45 (9th Cir. 1979). In Hernandez, the court stated:

> In light of [the informant's] role in the narcotic transaction with which the appellants were charged, it cannot be said that disclosure of Smith's identity would not have been "relevant or helpful" to the appellants' defense . . . because [the informant] was a participant in the events and [was] critical to the prosecution's case, no claim could be raised under Roviaro nor was it raised, that [the informant's] identity could be lawfully withheld from the appellants.

Hernandez, 608 F.2d 741 (9th Cir. 1979) (citations omitted).

Further, where an informant's testimony is essential to the defense, the government is required to disclose his\her identity and address. United States v. Roberts, 388 F.2d 646 (2d Cir. 1968); *see also* United States v. Anderson, 509 F.2d 724 (9th Cir. 1974) (it is within the court's discretion to compel disclosure of a confidential informant even when use of the informant goes only to probable cause), cert. denied, 420 U.S. 910 (1975).

At a minimum, the court should hold an in camera hearing to determine to appropriate extent of disclosure. The in camera hearing is a "favored procedure," triggered by a "minimal threshold showing that disclosure would be relevant to at least one defense." United States v. Spires, 3 F.3d 1234, 1238 (9th Cir. 1993); see United States v. Amador-Galvan, 9 F.3d 1414, 1417 (9th Cir. 1993) (district court erred in failing to hold in camera hearing concerning disclosure of identity of non-witness CI's). The discovery provided thus far demonstrates that the statements of the CI's will form the basis of any reasonable suspicion the agents had in investigating and arresting Mr. Crosby. The fact that the identities of the informants are “relevant and helpful” to Mr. Crosby's defense is obvious.

**B. Production of Informant for Interview.**

Because Mr. Crosby lacks information about the informant(s), the government's assistance is required in interviewing them prior to trial, and Mr. Crosby seeks an order to produce them. The government should make the informants available, or bear the burden of showing that it made reasonable efforts to secure their appearance. United States v. Montgomery, 998 F.2d 1468, 1472-73 (9th Cir. 1993). Mr. Crosby requests an opportunity to interview the informant(s) well in advance of trial, in view of his possible centrality to the defense; counsel respectfully suggests an interview date thirty days before trial. Further, follow up interviews may become necessary after the entire group of informants have been interviewed.

**C. Discovery Request.**

Mr. Crosby requests disclosure of the following impeaching information as to the informant(s) named in the discovery, and as to any other informer not yet made known to the defense. See United States v. Bernal-Obeso, 989 F.2d 331, 335 (9th Cir. 1993) (citing "stringent

discovery rules" and "vigorous cross-examination" as critical safeguards against injustices perpetrated by untrustworthy informants); United States v. Brumel-Alvarez, 991 F.2d 1452 (9th Cir. 1992). Information in the following categories is specifically requested as to any activity of the informant as an agent of the government or in exchange for benefits, whether connected to the instant case or not. See United States v. Shaffer, 789 F.2d 682, 685 (9th Cir. 1986) (affirming new trial order for failure to disclose, inter alia, informant's paid activity in unrelated investigation).

1) Any and all records and information revealing prior felony convictions, convictions for a crime involving false statements or dishonesty, or juvenile adjudications attributed to the informant, including, but not limited to relevant "rap sheets." See United States v. Alvarez-Lopez, 559 F.2d 1155 (9th Cir. 1977); Fed. R. Evid. 609.

2) Any and all records and information revealing prior misconduct or bad acts attributed to the informant, including, but not limited to, any acts of misconduct conducted by him. Fed. R. Evid. 608(b)(3); Weinstein's Evidence, 608[5] at 608-25 (1976).

3) Any and all consideration or promises of consideration given to the informant or expected or hoped for by him. By "consideration," Mr. Crosby refers to absolutely anything, whether bargained for or not, which arguably could be of value or use to him or to persons of concern to him. This request includes, but is not limited to formal or informal and direct or indirect leniency, favorable treatment or recommendations, or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, tax court, Internal Revenue Service, Court of Claims, administrative, or other dispute with the United States. See, e.g., Guam v. De la Rosa, 644 F.2d 1257, 1259 (9th Cir. 1980) (testimony secured by promise not to prosecute in exchange for cooperation).

"Consideration" also encompasses any favorable treatment or recommendations with respect to criminal, civil or tax immunity grants, relief from forfeiture, payments of money, permission to keep fruits of criminal activity including cash, vehicles, aircraft, rewards or fees, witness fees and special witness fees, provisions of food, clothing, shelter, transportation, legal services or other benefits, placement in a "witness protection program," and anything else that arguably could reveal an interest, motive, or bias in them in favor of the government or against the

defense, or which could act as an inducement to testify or to color testimony. See, e.g., Shaffer, 789 F.2d at 689 (any evidence tending to show tacit, as opposed to explicit, benefits, was subject to disclosure as fair impeachment material, including government's delay in instituting civil forfeiture proceedings).

4) Any and all threats, express or implied, direct or indirect, or other coercion made or directed against the informants, criminal prosecutions, investigations, or potential prosecutions pending, or which could be brought against then, any probationary, parole, deferred prosecution, or custodial status of the witnesses and any civil, tax court, court of claims, administrative, or other pending or potential legal disputes or transactions with the government or over which the government has real, apparent, or perceived influence. See Davis v. Alaska, 415 U.S. 308 (1974); United States v. Alvarez-Lopez, 559 F.2d 1155 (9th Cir. 1977); United States v. Sutton, 542 F.2d 1239 (4th Cir. 1976).

5) The existence of the identification of each occasion on which the informants have testified before the court, grand jury, or other tribunal or body in connection with this or other similar cases. See United States v. Alvarez-Lopez, 559 F.2d 1155 (9th Cir. 1977); Johnson v. Brewer, 521 F.2d 556 (8th Cir. 1975).

6) Any and all records and information which arguably could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the government's evidence or which arguably could lead to such records or such information. This request includes any evidence tending to show the narcotic habits of the informants at the time of relevant events, see, e.g, United States v. Bernard, 625 F.2d 854, 858-59 (9th Cir. 1980), and the informant's personal dislike of the defendant. See Guam v. De la Rosa, 644 F.2d 1257 (9th Cir. 1980); United States v. Haggett, 438 F.2d 396 (2d Cir. 1971), cert. denied, 402 U.S. 946 (1971). Moreover, the request specifically embraces material from the informant's probation files that bears on his credibility. United States v. Strifler, 851 F.2d 1197, 1201 (9th Cir. 1988) (court clearly erred in failing to disclose such material after in camera review), cert. denied, 489 U.S. 1032 (1989).

7) The names and criminal numbers of any an all other criminal cases, state or federal, in which the informant has been involved either as informant or as defendant. Any prior criminal

conduct on the part of the informant either as informant or as a defendant is relevant in establishing a possible defense of entrapment.

8) Any record, memorandum, letter, or document tending to reflect an adverse opinion of the informant's truthfulness, reliability, or motive to falsify. Brumel-Alvarez, supra.

Mr. Crosby is making these multiple requests because, in order to properly prepare a defense in this matter, it is important that the defense be aware of all information related to the informant's credibility and background. Giglio v. United States, 405 U.S. 150 (1972); Untied States v. Ray, 731 F.2d 1361 (9th Cir. 1984).

Cross-examination of the confidential informant may be a critical part of Mr. Crosby's defense. This cross-examination must be complete and thorough in order to protect Mr. Crosby's rights. Washington v. Texas, 388 U.S. 14 (1967). The defense must be aware of all information relating to the informant's credibility, including any biases, prejudices or motives, as well as the substantive evidence in the informant's possession regarding entrapment. The inherent unreliability of the testimony of accomplices or government informants underscores the need for complete disclosure of information relating to their credibility. See United States v. Caldwell, 466 F.2d 611 (9th Cir. 1972).

## III.

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

At this time Mr. Crosby has received **22 pages** of discovery. Mr. Crosby requests the following discovery. His request is not limited to those items that the prosecutor knows of. It includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989). Specifically, Mr. Crosby is requesting the following items that are covered by this motion and the rules of discovery pursuant to Rule 16:

(1) Arrest reports, conviction documents, information, surveillance photographs, and victim's statements from Mr. Crosby's four prior bank robberies;

(2) Copies of the notes given to the tellers in Crosby's prior bank robberies,

(3) Agent Hemmen reviewed bank robberies that were committed in San Diego county in 2007. Defense is requesting arrest reports, conviction documents, all information, surveillance videos, surveillance photographs, victim's statements, victim's identifications, notes, from these other bank robberies;

(4) Color copy of the six pack line up shown to Rachael Crampton;

(5) Contact information for Racheal Crampton;

(6) Surveillance (3) photographs shown to Lorena Gonzales;

(7) Any photo identifications made by Rachael Crampton;

(8) Lists of all agents/officers involved in investigation and/or responding to robbery;

(9) Copies of the two VHS videocassette tapes from bank's video surveillance equipment;

(10) Contact information for Mary Rae Collias (witness),

(11) Series of four photographs shown to Lorena Gonzalez;

(12) Surveillance photo shown to Chris Marco;

(13) Videotape of Crosby's statements at the La Mesa police department;

(14) Any and all fingerprints taken from the July 18, 2007, robbery;

(15) A list including names, contact information, and reports of all witnesses and/or percipient witnesses from the July 18, 2007 robbery;

(16) A copy of the handwritten note used in the July 18, 2007, robbery.

This list should not be considered all relevant discoverable items. Rather, this is simply a list of items that the defense has been able to identify as of this date as outstanding, discoverable items. As such, the defendant requests any and all information that falls within the following categories:

(1) Brady Material. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Under Brady, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

(2) Any Proposed 404(b) Evidence. The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions

which would be used to impeach as noted in Fed. R. Crim. P. 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. The defendant requests such notice two weeks before trial in order to give the defense time adequately to investigate and prepare for trial.

(3) Evidence Seized. The defendant requests production of evidence seized as a result of any search. Fed. R. Crim. P. 16(a)(1)(E). He wishes to inspect the evidence before trial. **Specifically, the defense requests the opportunity to inspect all physical evidence seized.** See Section III, below. **A preservation order is attached below for this Court's signature.**

(4) Request for Preservation of Evidence. The defendant specifically requests the preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case. This request includes, but is not limited to, any samples of narcotics used to run any scientific tests, any narcotics, the results of any fingerprint analysis, the vehicle which the defendant drove, the defendant's personal effects, and any evidence seized from the defendant or any third party.

In addition, Mr. Crosby specifically requests that the Assistant United States Attorney assigned to this case oversee a review of all personnel files of each agent involved in the present case for impeachment material. Kyles v. Whitley, 115 S. Ct. 1555 (1995); United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991); but see United States v. Herring, 83 F.3d 1120 (9th Cir. 1996).

(5) Tangible Objects. The defendant seeks to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant. Fed. R. Crim. P. 16(a)(1)(E). **A preservation order is attached below for this court to sign.**

(6) Expert Witnesses. The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness

during its case in chief. Fed. R. Crim. P. 16(a)(1)(G).

(7) Evidence of Bias or Motive to Lie. The defendant requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his testimony.

(8) Impeachment Evidence. The defendant requests any evidence that any prospective government witness has engaged in any criminal act, whether or not resulting in a conviction, and whether any witness has made a statement favorable to the defendant. See Fed. R. Evid. 608, 609 and 613; Brady v. Maryland.

(9) Evidence of Criminal Investigation of Any Government Witness. The defendant requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

(10) Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling. The defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.

(11) Witness Addresses. The defendant requests the name and last known address of each prospective government witness. The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a government witness.

(12) Name of Witnesses Favorable to the Defendant. The defendant requests the name of any witness who made an arguably favorable statement concerning the defendant.

(13) Statements Relevant to the Defense. The defendant requests disclosure of any statement relevant to any possible defense or contention that he might assert.

(14) Jencks Act Material. The defendant requests production in advance of trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at the request of defendant to investigate the Jencks material.

(15) Giglio Information. Under Giglio v. United States, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, express or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information which could arguably be used for the impeachment of any government witnesses.

(16) Scientific and Other Information. To the extent not already provided, the defendant requests the results of any scientific or other tests or examinations, including testing done on the alleged marijuana. See Rule 16(a)(1)(F).

(17) Informants and Cooperating Witnesses. The defense requests disclosure of the name(s), address(es), and location(s) of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the charged crime. Roviaro v. United States, 353 U.S. 52, 61-62 (1957). The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant. Brady v. Maryland, 373 U.S. 83 (1963). The government must disclose any information indicating bias on the part of any informant or cooperating witness. Id.

(18) Personnel Records of Government Officers Involved in the Arrest. Mr. Fuentes-Garibay specifically requests all citizen complaints and other related internal affairs documents involving any of the Customs officers or other law enforcement officers who were involved in the investigation, arrest and interrogation of his, pursuant to Pitchess v. Superior Court, 11 Cal. 3d 531, 539 (1974). Because of the sensitive nature of these documents, defense counsel will not be able to procure them from any other source.

(19) Government Examination of Law Enforcement Personnel Files. The defendant requests that the Government examine the personnel files and any other files within its custody, care or control, or which could be obtained by the government, for all testifying witnesses, including testifying officers. He requests that these files be reviewed by the Government attorney for evidence of perjurious conduct or other like dishonesty, or any other material relevant to impeachment, or any information that is exculpatory, pursuant to its duty under United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991). Only the prosecutor has the legal knowledge and ethical obligations to fully comply with this request.

(20) Residual Request. Mr. Crosby intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Mr. Crosby requests that the government provide her with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

## IV.

## THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE INSTRUCTIONS PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS*.

### A. *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury.

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord Navarro-Vargas I, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to

[6] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263).

Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." *See* id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); Marcucci, 299 F.3d at 1166-73 (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit. But not in Judge Burns' instructions.

**B. The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in Marcucci. Marcucci reasoned that the instructions do not mandate that

grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting *The Oxford American Diction and Language Guide* 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

Nor does the Navarro-Vargas II majority's faith in the structure of the grand jury a cure for the instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." Id. at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id.

After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Mr. Crosby understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states they enjoy. He also apparently excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced them. The instructions here are therefore structural error. See Navarro-Vargas II, 408 at 1216-17 (Hawkins, J., dissenting). The indictment must be dismissed.

//

//

**C. The Instructions Conflict With *Williams*' Holding that there Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id. at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.

Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27.

//

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1) I have to consider evidence that undercuts probable cause.

(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3) Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions therefore discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is

nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## V.

## LEAVE TO FILE FURTHER MOTIONS

Mr. Crosby and defense counsel have received **22** pages of discovery in this case. As new information surfaces – via discovery provided by government, defense investigation, or an order of this court – the defense will file further motions, or to supplement existing motions. For this reason, defense counsel requests leave to file further motions.

## VI.

## CONCLUSION

For the reasons stated, Mr. Crosby requests that this Court grant his motions.

Respectfully Submitted,

s/ *Kasha K. Pollreisz*

Dated: January 14, 2008

**KASHA K. POLLREISZ**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Crosby
Kasha_Pollreisz@fd.org

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE JANIS L. SAMMARTINO)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>**TRAVIS CROSBY,**<br>Defendant. | ) | CASE NO. 07CR3236-JLS<br><br>ORDER |

**FOR GOOD CAUSE SHOWN, IT IS HEREBY ORDERED** that:

The government preserve the following evidence during the pendency of this case: items seized from Mr. Crosby, either on his person or at his house, any and all physical evidence taken from the bank, the surveillance video from the bank, all photographs shown to potential witnesses. Further, that all government agencies and private contractors having custody of such evidence be notified of this preservation order and that defense counsel and/or their agents and investigators be granted access to such evidence .

**SO ORDERED**.

DATED: ____________________

____________________
**HONORABLE JANIS L. SAMMARTINO**
United States District Court Judge